J-A20009-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN THE INTEREST OF: S.K.L.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: WESTMORELAND COUNTY CHILDREN'S BUREAU | : | |
| | : | |
| | : | |
| | : | No. 440 WDA 2020 |

Appeal from the Order Dated February 6, 2019
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s): 34 of 2019

| | | |
|---|---|---|
| IN THE INTEREST OF: L.M.J.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: WESTMORELAND COUNTY CHILDREN'S BUREAU | : | |
| | : | |
| | : | |
| | : | No. 441 WDA 2020 |

Appeal from the Order Entered February 6, 2019
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s): 35 of 2019

BEFORE:  BOWES, J., OLSON, J., and MUSMANNO, J.

MEMORANDUM BY BOWES, J.:                     FILED NOVEMBER 13, 2020

Westmoreland County Children's Bureau (the "Agency") appeals from

the orders entered on February 10, 2020,[1] wherein the orphans' court denied

_____

[1] This Court consolidated these appeals sua sponte.  While there is no notation on the docket that notice of the underlying orders was given for purposes of Pa.O.C.R. 4.6(b), as neither party was prejudiced by the misstep, we deem done that which ought to have been done and consider the merits of the

the Agency's petitions to involuntarily terminate the parental rights of Mother and Father to their son, S.K.L.R., born in September 2014, and daughter, L.M.J.R., born in December 2015. We reverse and remand.

The orphans' court summarized the procedural and factual history as follows:

> Beginning in September 2017, the Agency offered services to Mother and her husband, [T.S.H.], the father of her third child, [B.H.[2]], who was born [in July 2017]. The Agency had concerns that Mother was overwhelmed with caring for three young children under the age of three years. It had been reported that Mother was "rough with the children when disciplining them and struggles to demonstrate appropriate parenting." In addition, Mother had a history of mental health issues. Services through Justice Works and Wesley Spectrum Services were offered.
>
> On December 5, 2017, the Agency received a referral from Children's Hospital regarding the minor child [B.H.], who was then four (4) months old. [B.H.] underwent a CT scan and MRI testing as a result of having an increased head circumference. Test results revealed ongoing subdural hematomas on both sides of the child's head. Hospital personnel were concerned these findings indicated non-accidental trauma; Mother had no explanation for the child's condition. On December 7, 2017, the Agency assumed emergency custody of Mother's three minor children; and on December 11, 2017, after a shelter care hearing, the children were retained in Agency custody.
>
> . . . .
>
> On January 19, 2018, the children were adjudicated dependent and ordered to remain in Agency custody with continued placement in their respective kinship foster homes.

_____

appeals. See Johnston the Florist, Inc. v. TEDCO Constr. Corp., 657 A.2d 511, 514-515 (Pa. Super. 1995) (en banc). Nevertheless, we admonish the Court of Common Pleas of Westmoreland County for disregarding the procedural rules governing the entry of orders.

[2] B.H. is not a subject of these appeals.

[Since nineteen months before the termination hearings, S.K.L.R. and L.M.J.R. have resided together in a pre-adoptive kinship foster home.]  Mother was directed to continue with mental health treatment and individual counseling, and take prescribed medications; participate in nurturing parenting instruction, which should include a parenting curriculum and/or hands-on parenting instruction; participate in life skills services, including instruction on home maintenance and budgeting and connections to community resources; participate in anger management counseling; obtain and maintain appropriate and stable housing, and keep it in a clean and safe condition; and secure and maintain a verifiable legal source of income.

Order and Opinion, 2/10/20, at 3-9 (footnotes omitted) (cleaned up).

As late as January 2, 2019, Mother's compliance was assessed as substantial and her progress moderate.  Thereafter, on July 22, 2019, Mother's compliance was assessed as moderate and her progress minimal. Both her compliance and her progress have consistently been assessed as minimal since July 2019.  Additionally,

[Father] was directed to participate in all counseling services available to him and provide written verification of completion of such services to the caseworker.  Upon his release from incarceration [at SCI-Camp Hill on convictions for possession of drug paraphernalia, firearm violations, theft, and flight to avoid apprehension], Father was directed to contact the Agency for an assessment for services that would be necessary to assist in reunification if he is interested in having a relationship with [S.K.L.R.] and [L.M.J.R.].

. . . .

On April 12, 2019, Mother signed a "Consent to Adoption of Birth Parent or Putative Father Who Is Relinquishing Parental Rights," agreeing to the voluntary termination of her parental rights with respect to [S.K.L.R. and L.M.J.R.].  Mother did not withdraw her consent documents within thirty (30) days of signing them (under 23 Pa.C.S. § 2711), nor did she challenge the consents on the basis of misrepresentation, fraud or duress, within sixty (60) days of signing.  However, at the hearing held on June

> 26, 2019, to confirm the consents (75 days after signing), she appeared before the court and stated she wished to revoke her consents to voluntary termination of her parental rights. Upon consideration of Mother's request to withdraw consents to adoption, by order of court dated December 20, 2019, th[e trial] court granted her request in that the consents did not name or otherwise identify the adopting parents nor did they contain a statement that they were voluntarily executed without disclosure of the name or other identification of the adopting parents, contrary to the requirements of 23 Pa.C.S. § 2712. The consents to adoption were not confirmed.

Id. at 9-13 (cleaned up).

The Agency did not appeal the December 20, 2019 orders permitting Mother to revoke her consent to adoption. Indeed, the Agency contends that it did not receive notification of the December 2019 order until March 6, 2020. On March 28, 2019, the Agency filed petitions for the involuntary termination of the parental rights of Mother and Father to both children pursuant to 23 Pa.C.S. § 2511(a) and (b). Mother appeared with counsel during the ensuing hearing. Father, also represented by counsel, participated via telephone from prison. S.K.L.R. and L.M.J.R. were both represented by Dorean Petonic, Esquire, who was originally appointed as guardian ad litem during the prior dependency proceedings.[3] In addition to Tara Lorenzo, the caseworker assigned to the family, the Agency presented the testimony of Kelsey Oddis

_____

[3] Attorney Petonic informed the court that she was able to represent the legal interests of S.K.L.R. and L.M.J.R. as well as their best interests without conflict. N.T., 1/16/20, at 3. See In re Adoption of L.B.M., 161 A.3d 172, 175, 180 (Pa. 2017) (plurality) (pursuant to 23 Pa.C.S. § 2313(a), child subject of contested involuntary termination proceeding has statutory right to counsel who discerns and advocates for the child's legal interests).

- 4 -

and Amy Kowalewski, the family resource specialist and supervisor, respectively, from Justice Works Community Center. They also called Taylor Patton, the mental health and drug and alcohol counselor from Southwestern Pennsylvania Human Services ("SPHS"). Mother and Father each testified on their own behalf.

By orders entered on February 10, 2020, the orphans' court denied the Agency's petitions to involuntarily terminate the parental rights of Mother and Father. In sum, the court concluded that the termination of parental rights was premature because Mother had made a modicum of progress, albeit inconsistently, and the Agency presented a dearth of evidence concerning whether severing the parent-child relationships would serve the developmental, physical, and emotional needs and welfare of the children. Having preserved Mother's rights, the orphans' court also determined that Father had similarly progressed little during his incarceration, but provided him additional time to fulfil his parental obligations, presumably after his anticipated release from incarceration when next eligible for parole in May 2020.[4]

The Agency filed timely notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The orphans' court directed the Agency to file a supplemental statement of

_____

[4] Father was previously denied parole on October 28, 2019.

errors, and the Agency complied. The court issued its Rule 1925(a) opinion on March 27, 2020.

The Agency raises the following questions for our review:

1. Did the orphans' court err as a matter of law or abuse its discretion in its analysis of 23 Pa.C.S. § 2504, 23 Pa.C.S. § 2711, and 23 Pa.C.S. §2712?

2. Did the orphans' court err as a matter of law or abuse its discretion in its analysis of 23 Pa.C.S. § 2511(a), 23 Pa.C.S. § 2511(a)(2), 23 Pa.C.S. § 2511(a)(5), 23 Pa.C.S. § 2511(a)(8), and 23 Pa.C.S. § 2511(b)?

3. Did the orphans' court err as a matter of law or abuse its discretion in weighing . . . Mother's ability to parent another child who was not the subject of the termination proceedings in its opinion and order denying the Agency's petition to involuntarily terminate . . . Mother's parental rights to the subject children of the petitions?

4. Did the orphans' court err as a matter of law or abuse its discretion in independently analyzing the issue of hearsay in its opinion, thereby excluding witness testimony when no objection was raised at trial, in violation of the Pennsylvania Rules of Evidence and the Code of Judicial Conduct?

5. Did the orphans' court abuse its discretion in demonstrating bias against termination of parental rights proceedings, in violation of the Code of Judicial Conduct?

6. Are the findings of fact and credibility determinations set forth in the orphans' court's opinion inconsistent with prior statements made by this same [orphans'] court during this same matter and unsupported by the record?

Agency's brief at 4-5 (cleaned up).[5]

First, we address whether the Agency preserved its challenge to the orphans' court's December 20, 2019 orders permitting Mother to withdraw her

_____

[5] Attorney Petonic joined the Agency's brief except as to issue five, relating to the trial court's purported bias. See Letter Joining Brief, 8/3/20.

consents to adoption when it neglected to appeal the orders within thirty days. Essentially, the Agency asserts that the December 2019 orders were not final or appealable, and that the issue can be raised in conjunction with the instant appeal. Notwithstanding the Agency's protestations, we need not determine finality under the current procedural posture.

Assuming arguendo that the court's December 20, 2019 orders were final and appealable, the appeal period was never triggered in this case because there is no notation on the docket that notice was given pursuant to Pa.O.C.R. 4.6(b), the orphans' court procedural analog to Pa.R.C.P. 236(b). See Frazier v. City of Philadelphia, 735 A.2d 113, 115 (Pa. 1999) (holding, "an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given"); see also Pa.R.A.P. 108(b) (entry of an order is designated as "the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.C.P. 236(b)".). While the orphans' court directed the clerk of court to note in the docket that the parties listed on the orders have been given notice, and the docket reflects a filed date of December 20, 2019, there is no notation on the docket that notice was given and that the order was entered for purposes of Pa.O.C.R. 4.6(b). Thus, the appeal period was never triggered. See Pa.O.C.R. 4.6(b); Frazier, supra at 115. Accordingly, we address the merits of the Agency's argument that the court erred in permitting Mother to revoke her consent.

The Agency asserts that Mother neglected to challenge the validity of the consents within the statutory period. Agency's brief at 19. The following principles inform our decision. "We review a revocation of consent to adoption in relation to a voluntary relinquishment of parental rights for an abuse of discretion or legal error. We must determine whether the record is free from legal error and the court's factual findings are supported by the evidence." In re R.I., 172 A.3d 665, 666-67 (Pa.Super. 2017) (internal citations omitted). The Adoption Act provides two alternative procedures by which a parent may relinquish his or her parental rights voluntarily. The case at bar involves the procedure where the parent executes a consent to adoption, and an agency or adoptive parent files a petition to confirm that consent.[6] This procedure is set forth at § 2504, which provides as follows, in relevant part:

_____

[6] Additionally, a parent may file a petition to relinquish his or her parental rights to an agency pursuant to § 2501 of the Adoption Act, which provides as follows:

> (a) Petition.--When any child under the age of 18 years has been in the care of an agency for a minimum period of three days or, whether or not the agency has the physical care of the child, the agency has received a written notice of the present intent to transfer to it custody of the child, executed by the parent, the parent or parents of the child may petition the court for permission to relinquish forever all parental rights and duties with respect to their child.

> (b) Consents.--The written consent of a parent or guardian of a petitioner who has not reached 18 years of age shall not be required. The consent of the agency to accept custody of the child until such time as the child is adopted shall be required.

23 Pa.C.S. § 2501.

(a) Petition to confirm consent to adoption.--If the parent or parents of the child have executed consents to an adoption, upon petition by the intermediary or, where there is no intermediary, by the adoptive parent, the court shall hold a hearing for the purpose of confirming a consent to an adoption upon expiration of the time periods under section 2711 (relating to consents necessary to adoption). The original consent or consents to the adoption shall be attached to the petition.

(b) Hearing.--Upon presentation of a petition filed pursuant to this section, the court shall fix a time for a hearing which shall not be less than ten days after filing of the petition. Notice of the hearing shall be by personal service or by registered mail or by such other means as the court may require upon the consenter and shall be in the form provided in section 2513(b) (relating to hearing). Notice of the hearing shall be given to the other parent or parents, to the putative father whose parental rights could be terminated pursuant to subsection (c) and to the parents or guardian of a consenting parent who has not reached 18 years of age. The notice shall state that the consenting parent's or putative father's rights may be terminated as a result of the hearing. After hearing, which shall be private, the court may enter a decree of termination of parental rights in the case of a relinquishment to an adult or a decree of termination of parental rights and duties, including the obligation of support, in the case of a relinquishment to an agency.

23 Pa.C.S. § 2504(a)-(b).

The relevant time periods for the § 2504 procedure, as well as the requirements that a consent must meet in order to be valid, are established by § 2711. Of particular relevance to these appeals, § 2711(c)(1)(i) provides that a consent will become irrevocable if a parent does not revoke it within thirty days of its execution, while § 2711(c)(3)(i)(A) provides that a parent may challenge the validity of a consent by filing a petition alleging fraud or duress within sixty days of its execution:

(c) Validity of consent.--. . . . A consent to an adoption may only be revoked as set forth in this subsection. The revocation of

a consent shall be in writing and shall be served upon the agency or adult to whom the child was relinquished. The following apply:

(1) Except as otherwise provided in paragraph (3):

(i) For a consent to an adoption executed by a birth father or a putative father, the consent is irrevocable more than 30 days after the birth of the child or the execution of the consent, whichever occurs later.

. . . .

(3) Notwithstanding paragraph (1), the following apply:

(i) An individual who executed a consent to an adoption may challenge the validity of the consent only by filing a petition alleging fraud or duress within the earlier of the following time frames:

(A) Sixty days after the birth of the child or the execution of the consent, whichever occurs later.

(B) Thirty days after the entry of the adoption decree.

23 Pa.C.S. § 2711(c)(1) and (c)(3)(i) (emphases added).

As to revocation of a consent, this Court has stated that the trial court may not proceed to consider the substantive merits of a revocation if such revocation is untimely. See *In re Adoption of J.A.S.*, 939 A.2d 403, 408–09 (Pa.Super. 2007). In finding that a trial court erred and improperly dismissed a father's petition for voluntary relinquishment due to an oral revocation more than thirty days after execution, this Court acknowledged, "This Court has held that 'the statute renders a consent to adoption irrevocable more than thirty (30) days after execution,' and the unambiguous language of the statute requires a trial court to consider the timeliness of a petition to

- 10 -

revoke before it considers the merits of such a petition."[7]  In re R.I., *supra* at 666–67 (quoting In re Adoption of J.A.S., *supra* at 408–09).

In addition, as it relates to the orphans' court's decision to permit Mother to revoke her consents based upon patent procedural deficiencies, § 2712 provides:

> A consent to a proposed adoption meeting all the requirements of this part but which does not name or otherwise identify the adopting parent or parents shall be valid if it contains a statement that it is voluntarily executed without disclosure of the name or other identification of the adopting parent or parents.

23 Pa.C.S. § 2712.

In a recent decision, In re J.W.B., 232 A.3d 689 (Pa. 2020), our Supreme Court clarified the procedure to confirm consent pursuant to § 2504. The High Court explained that the purpose of a hearing to confirm a parent's consent is not merely to determine whether he or she has attempted to revoke a consent or challenge its validity within the relevant time periods.  Rather, the trial court must also "review the consents and consider any and all arguments raised by the parties challenging their conformity with the Adoption Act."  Id. at 700.  The Court observed, for example, that § 2711(d) "includes an exhaustive list of the information that must be included in the consent document," and explained that a parent may challenge the absence of such information in the consent even after the relevant time periods expire.  Id. at 701 ("The specific provisions of § 2711, including in particular

_____

[7] In R.I., the father attempted to orally revoke his consent seventy-two days after execution of a petition for voluntary relinquishment.

the time limitations for revocation or a validity challenge based upon fraud or duress, are premised on the execution of a consent that complies with the legislature's statutory requirements.").

In support of its decision to grant the revocation of Mother's consents, the orphans' court stated,

> The rationale behind this court's decision to grant birth mother's "Request to Withdraw Consents to Adoption" can be found in the order of court dated December 20, 2019. In that order, we explained that the confirm consents were defective in that they did not name or otherwise identify the adopting parent or parents nor did they contain a statement that they were voluntarily executed without disclosure of the name of other identification of the adopting parent or parents, contrary to the requirements of 23 Pa.C.S. § 2712.

Orphans' Court Opinion, 3/27/20, at 3 (cleaned up) (emphasis added).

For the reasons explained below, we do not disturb the orphans' court's rationale. Mother executed consents to adoption on April 12, 2019 and attempted to revoke such consents on June 26, 2019. As acknowledged by the court, Mother's revocation of her consents occurred seventy-five days after execution, more than the thirty days mandated by § 2711(c). Order and Opinion, 2/10/20, at 13. However, as in *In re J.W.B.*, the consents did not conform to the statutory requirements of the Adoption Act. Specifically, as the orphans' court accurately observed, the consents omitted the name or identity of the adopting parents or a statement that the consents were voluntarily executed without those disclosures, as required by 23 Pa.C.S. § 2712. We equate this procedural oversight with the type of technical omissions under § 2711 addressed in *In re J.W.B.*, supra 700-01.

- 12 -

Stated plainly, unless a consent to adoption complies with the legislature's statutory requirements, the time limitations do not preclude revocation. Id. at 701 (time limitations are premised on execution of a consent that complies with statutory requirements). As phrased by the High Court, "a consent document that does not comply with the statutory requirements will be readily apparent upon receipt by the party or parent procuring the consent. It can be corrected and, if not, there is no consent and termination of parental rights can proceed by way of involuntary termination procedures. Id. at n.6 (emphasis added). Accordingly, because Mother's consents to adoption were not in conformity with § 2712 there was no consent, and the orphans' court did not err in granting Mother's petitions to withdraw her consents and proceeding to the involuntary termination of her parental rights.

Next, we examine the orphans' court's denial of the Agency's petitions to terminate the parental rights of Mother and Father, respectively. In matters involving the involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." In re Adoption of S.P., 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." Id. "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." Id. The trial court's decision, however, should not be reversed merely

because the record would support a different result. Id. at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. See In re R.J.T., [9 A.3d 1179, 1190 (Pa. 2010)].

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." In re M.G. & J.G., 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." In re Adoption of T.B.B., 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by § 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child:

> Our case law has made clear that under § 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in § 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to § 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re L.M., 923 A.2d 505, 511 (Pa.Super. 2007) (cleaned up). Clear and convincing evidence is that which is so "clear, direct, weighty and convincing

as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." In re C.S., 761 A.2d 1197, 1201 (Pa.Super. 2000) (en banc) (citation omitted).

In the case sub judice, the Agency petitioned to terminate the parental rights of Mother and Father pursuant to 23 Pa.C.S. § 2511(a)(5), (8), and (b). In addition, as to Father only, the Agency asserted subsection (a)(2). The pertinent subsections provide as follows:

> (a)   General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>      . . . .
>
> (2)   The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
>      . . . .
>
> (5)   The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
>
>      . . . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . . .

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (5), (8), and (b). Termination is proper when the Agency proves grounds for termination under any subsection of § 2511(a) and § 2511 (b). See In re Adoption of T.B.B., 835 A.2d 387, 395 (Pa.Super. 2003). If the court finds that the Agency has satisfied the statutory grounds for termination, "it must then determine whether the termination of parental rights serves the best interests of the child." In re C.T., 944 A.2d 779, 782 (Pa.Super. 2008).

In explaining its reasons for denying the termination petitions, the orphans' court provided the following summary:

Based upon our careful consideration of the evidence presented, we do not find that a large majority of the conditions which led to the removal of [S.K.L.R. and L.M.J.R.] from Mother's care continue to exist; and we do not find that Mother cannot or will not remedy the remaining conditions, particularly pertaining to addressing her

- 16 -

mental health needs, within a reasonable period of time, given the services and assistance she is now embracing and her realization of the gravity of her potential loss. She is developing life skills that will lead to a steady income, housing, stability, and the ability to parent. She is progressing toward those goals. She is appropriately mothering her youngest child, who has been in her custody since birth without Agency involvement. In other words, with a few more months of steady progress, Mother may avoid losing parental rights to her [c]hildren permanently.

If Mother and Father fail to benefit from the resources currently available to them, if they fail to maintain adequate housing, if they fail to remain sober, if they fail to maintain a legal source of income, if Mother fails to address her mental health needs, if Mother resumes involvement in an abusive relationship, this [c]ourt will consider all those factors if subsequent petitions for termination of parental rights are filed.

The purpose of the involuntary termination provisions of the Adoption Act is not to punish an ineffective or negligent parent. [In re B.E.], 377 A.2d 153, 156 (Pa. 1977). The purpose of the involuntary termination of parental rights process is to dispense with the need for parental consent to an adoption when, by choice or neglect, a parent has failed to meet the continuing needs of the child. In this case, we find that Mother is attempting to do what is necessary to be able to meet the continuing needs of her [c]hildren. Termination of her rights under the current circumstances is premature. By extension, Father's rights will not be terminated at this time either. This will allow him a reasonable period of time after release from incarceration, presumably in May 2020, to remedy further the conditions which led to [S.K.L.R.'s and L.M.J.R.'s] removal from the home. We will not terminate either Mother's or Father's rights at this time.

Opinion and Order, 2/10/20, at 27-28.

We will separately address the Agency's arguments relating to the orphans' court's respective decisions to deny the petitions as to Mother and Father, beginning with Mother. The Agency contends that it established grounds for involuntary termination of her parental rights pursuant to §

2511(a)(8), and (a)(5), due to her lack of compliance with the services required for reunification. Agency brief at 34. Similarly, the Agency alleged that Mother was engaging in substance abuse, attended only eight of twenty-six visitations in the six month period between January 3, 2019 to July 22, 2019 and that she is easily agitated during her visits with S.K.L.R. and L.M.J.R. Id.

> As it concerns subsection (a)(8),
>
> In order to terminate parental rights pursuant to 23 Pa.C.S. § 2511(a)(8), the following factors must be demonstrated: (1) The child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child.

In re Adoption of M.E.P., 825 A.2d 1266, 1275-76 (Pa.Super. 2003). Once this twelve-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of the agency supplied over a realistic period. In re A.R., 837 A.2d 560, 564 (Pa.Super. 2003). The "relevant inquiry in this regard is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." In re I.J., 972 A.2d 5, 11 (Pa.Super. 2009). "Notably, termination under [§] 2511(a)(8) . . . does not require an evaluation of [a parent's] willingness or ability to remedy the conditions that led to placement of her

children."  In re Adoption of R.J.S., 901 A.2d 502, 511 (Pa.Super. 2006) (citations omitted) (emphasis in original).[8]

Upon review of the parties' briefs and the certified record, we conclude that the court abused its discretion in finding that the Agency failed to satisfy its evidentiary burden under § 2511(a)(8) with respect to Mother.  The record demonstrates that S.K.L.R. and L.M.J.R. had been removed from parental care for a period exceeding twelve months and that the reasons for removal persisted.  See In re T.S.M., supra at 267; see also In re I.J., supra at 11.

First, the orphans' court erred to the extent that it sought to invoke the fact that Mother maintains custody of her youngest child as a basis to forego the termination of her parental rights to S.K.L.R. and L.M.J.R.  It is beyond peradventure that "evidence concerning a parent's ability to care for another child is irrelevant and inadmissible in a proceeding to terminate parental rights with regard to the child at issue."  In re A.L.D., 797 A.2d 326, 338 (Pa.Super. 2002) (citations omitted).

_____

[8] We observe that Sections 2511(a)(8) and (b) both require a court considering a termination petition to assess the needs and welfare of the relevant child or children.  However, the needs and welfare analysis required by Section 2511(a)(8) is distinct from the needs and welfare analysis required by Section 2511(b), and must be addressed separately.  See In re C.L.G., 956 A.2d 999, 1009 (Pa.Super. 2008) (en banc) ("[W]hile both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the 'needs and welfare of the child,' . . .  they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).").

Turning to the relevant inquiry, the agency established that S.K.L.R. and L.M.J.R. were out of Mother's custody for more than twelve months as they were removed from her care and custody on December 7, 2017. N.T., 1/16/20, at 46, 146. Furthermore, the conditions which led to removal, Mother's mental health problems, still exist. This was confirmed by Agency caseworker, Tara Lorenzo. Id. at 81. Specifically, Ms. Lorenzo testified that "Mother's mental. . . health issues remain inadequately addressed, which is seen by the visitation supervisors and reflected in their monthly reports. . . ." Id. at 78. Notably, Mother had received mental health treatment and/or services from several providers, but was last discharged unsuccessfully on June 6, 2019. Id. at 49-52. Ms. Lorenzo reported no knowledge of Mother's current participation in any treatment. Id. at 52. She did acknowledge that Mother informed her that she was taking over-the-counter stress gummies in lieu of her prescribed medication. Id. Ms. Lorenzo further noted that, while Mother completed a parenting curriculum, as well as anger management, these still presented as concerns and barriers to reunification:

> I believe the main barrier would be the parenting and not making enough progress within the parenting. She did complete the curriculum, but it has continually been reported that she doesn't utilize the skills that she has learned from that curriculum which would be shown through the way she easily gets triggered and frustrated whenever the children don't listen, which would also be a concern in regards to her anger management. Although she was successfully discharged from anger management, there is still the concern that, if triggered, she can explode. There's still a lack of engagement with [S.K.L.R. and L.M.J.R.]. It's concerning to the Agency that although [M]other only receives two visits per

month for two hours per visit, that she typically is engaged with her phone rather than engaging with [S.K.L.R. and L.M.J.R.].

. . . .

Although she has completed some services, I feel, and the Agency feels[,] that the situation that was present back when the kids came into Agency custody still remains.

Id. at 87-88; see also id. at 100-01. As to Mother's engagement and interaction with S.K.L.R. and L.M.J.R. during visitations, Kelsey Oddis, the family resource specialist from Justice Works, confirmed moderate and occasional engagement with the children on the floor "[a]bout a handful of times throughout the visit." Id. at 13, 17. Indeed, Ms. Oddis and Ms. Lorenzo, the Agency caseworker, both testified that Mother typically puts in a movie and is occupied on her phone during visitation. Id. at 17-18, 58, 65-66. Mother acknowledged this behavior. Id. at 132-34.

Similar to Ms. Oddis's observations, Ms. Lorenzo rated Mother's compliance and progress as minimal. Id. at 107-08. She stated,

> If I had to today, I would rate [M]other's compliance as, with being put on the spot, minimal compliance just due to she's currently not addressing her mental health and taking medications. She has reported to me that she has sent me her schedule; however, I have not received that. I don't have verification of that employment.
>
> I know that -- and I will have to double check the contract that we have currently with Justice Works, but I am asking for them to provide hands-on parenting instruction during the visitation, and per the testimony, it doesn't seem like that is occurring. It simply seems like they are supervising the visits and that's it, which I am actually asking them to provide hands-on instruction, and that is currently in the [c]ourt [o]rder for [M]other to cooperate with parenting, and that would include a curriculum and hands-on parenting instruction. Now, I know that's not [M]other's fault if that's not occurring, but. . .

> And she is also [c]ourt[-o]rdered to have stable, secure, and maintain stable and appropriate housing. She does have housing, but it's not her independent housing; she has resided with her maternal grandmother.
>
> In regards to progress, I would rate her progress as minimal as well.

Id.

Most importantly, we observe that the orphans' court itself acknowledged that Mother has not remedied all conditions leading to removal of S.K.L.R. and L.M.J.R., in particular mental health, but speculates that she may do so in the future. It opined, "We do not find that Mother cannot or will not remedy the remaining conditions, particularly pertaining to addressing her mental health needs, within a reasonable period of time. . . . In other words, with a few more months of steady progress, Mother may avoid losing parental rights to her [c]hildren permanently." Opinion and Order, 2/10/20, at 27-28 (emphasis added).

Importantly, unlike the grounds outlined in § 2511(a)(5), there is no component of subsection (a)(8) that requires evidence that a parent cannot remedy the underlying conditions within a reasonable period of time or that continued services would not likely alleviate the conditions which led to placement. Hence, the portion of the orphans' court's dedication to Mother's anticipated progress is not only entirely speculative, but also statutorily irrelevant to the § 2511(a)(8) analysis. In re Adoption of R.J.S., supra at 511.

Next, examining the third prong with respect to subsection (a)(8), the Agency presented clear and convincing evidence that termination would serve the needs and welfare of S.K.L.R. and L.M.J.R. Ms. Lorenzo reported that Mother attended a total of eighty out of one hundred twenty-one visits with S.K.L.R. and L.M.J.R. N.T., 1/16/20, at 56. Between January 3, 2019 and July 22, 2019, the six-month period encompassing the filing of the termination petitions, Mother attended only eight out of twenty-six visits. Id. Although Mother's visitation had briefly progressed to monitored, it reverted to supervised and resumption of monitored visits was foreclosed. Id. at 54-55, 61-62, 64. Importantly, S.K.L.R. and L.M.J.R. looked to people other than Mother to meet their needs during visitation. Id. at 13, 17, 62-64.

Further, S.K.L.R. and L.M.J.R. presently are together in a pre-adoptive kinship foster home where they have resided for nineteen months, are thriving, and their needs are being met. Id. at 80-82. Similarly, although happy to see Mother at visitation, they view their foster mother as their parent. Id. at 83-84. Tellingly, Ms. Lorenzo observed, "[S.K.L.R. and L.M.J.R.] look to their kinship foster mother as their parent, not saying that [S.K.L.R. and L.M.J.R.] don't enjoy going to see their mother, but I feel that they still consider foster mom to be their mom." Id. at 84. As such, Ms. Lorenzo testified that termination would best serve the needs and welfare of S.K.L.R. and L.M.J.R. Id. at 81. She explained,

> [S.K.L.R. and L.M.J.R.] have been in Agency custody for the past
> 25 months; they have remained in their pre-adoptive kinship

home for the past 19 months; all of their needs are currently being addressed in the home; they have an appropriate parent/child relationship with their foster mother. Both [M]other and [F]ather have demonstrated that they are not in a position to reunify with [S.K.L.R. and L.M.J.R.] at this time; and they have not completed all the necessary services to enable them to provide [S.K.L.R. and L.M.J.R.] with a stable and appropriate living environment.

Id. at 80. Ms. Lorenzo continued, "They are doing well in the foster home. I observe them to go to foster mother, to show affection towards foster mother, they seek her attention, they want her engagement, they ask her to play. It's my observation that they are flourishing in the foster home." Id. at 82. Moreover, Ms. Lorenzo indicated that S.K.L.R. and L.M.J.R. do not talk about their parents, and that terminating parental rights would not sever a necessary and beneficial relationship. Id. at 84. As the preceding evidence refutes the orphan court's determination that the Agency failed to satisfy its evidentiary burden under § 2511(8), the court abused its discretion in denying the petition as to Mother on that basis.

Finally, in relation to the needs and welfare analysis in accordance with § 2511(b), our Supreme Court has observed,

The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." In re K.M., 53 A.3d 781, 791 (Pa.Super. 2012). In In re E.M., 620 A.2d 481, 485 (Pa. 1993), this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. In re K.M., 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

In re T.S.M., supra at 267 (cleaned up). "The extent of any bond analysis . . . necessarily depends on the circumstances of the particular case." In re K.Z.S., 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, § 2511(b) does not require a formal bonding evaluation." In re Z.P., 994 A.2d 1108, 1123 n.3 (Pa.Super. 2010) (internal citations omitted). Moreover, "the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent." In re Adoption of C.D.R., 111 A.3d 1212, 1219 (Pa.Super. 2015) (quoting In re N.A.M., 33 A.3d 95, 103 (Pa.Super. 2011)) (cleaned up).

Instantly, the orphans court observed a meaningful bond between Mother and her children and found that the Agency presented a dearth of evidence concerning the effect of severing of that bond. Trial Court Opinion, 2/10/20, at 25. Again, the record belies the court's determination.

In addition to the foregoing testimony relating the children's best interest in relation to 2511(a)(8), we highlight that Ms. Lorenzo opined that termination of parental rights in anticipation of adoption supports the developmental, physical, and emotional needs and welfare of S.K.L.R. and L.M.J.R. N.T, 1/16/20, at 81. She continued that all of the children's needs are currently being addressed in the home, they have a strong parent/child relationship with their foster mother, and that terminating parental rights

would not sever a necessary and beneficial relationship. Id. at 81, 84. As the orphans' court accurately observed, "According to Lorenzo, the Foster Parents are meeting all of the Children's needs and the Children are flourishing in their home. The Children do not talk about their biological parents [and] [t]hey consider their Foster Mother to be their "Mom[.]" Trial Court Opinion, 2/10/20, at 19-20. While the orphans' court asserts that Ms. Lorenzo's statement about the children flourishing was insufficient evidence of the effect of terminating parental rights, for reasons identical to those stated above in relation to the § 2511(a)(8) analysis, we conclude that the court abused its discretion in finding that the Agency failed to satisfy its evidentiary burden under § 2511(b) as to Mother. See T.S.M., supra at 267. As previously noted, the Agency was not required to present expert testimony or a bonding evaluation, and Ms. Lorenzo's testimony established by clear and convincing evidence that terminating parental rights in anticipation of adoption served the developmental, physical, and emotional needs and welfare of both children. In re Z.P., supra at 1121.

Having found that the orphans' court erred in failing to grant the Agency's petition to terminate Mother's parental rights, we next address the court's decision as to Father, whose incarceration predates the removal of S.K.L.R. and L.M.J.R. from Mother's care and control. The gravamen of the orphans' court's decision to deny the petitions for the termination of parental rights was that, since Mother's rights would be preserved, "[b]y extension, Father's rights will not be terminated at this time either." Trial Court Opinion,

2/10/20, at 28. The orphans' court reasoned that this reprieve would provide an additional opportunity for Father to make headway toward reunification following his release. Id. It expounded upon its decision as follows:

> But for his sobriety while incarcerated, the completion of a few classes in jail, and sporadic contact with his children, [Father] is a long way from making headway toward reunification with his family any time soon. . . . If after a reasonable period of time following his release, Father has not made significant strides toward remedying the conditions and causes of the incapacity and neglect that resulted in. the Children's removal from his home, these circumstances will militate against him in a subsequent termination proceeding.

Trial Court Rule 1925 Opinion, 3/27/20.

Notwithstanding the magnanimity of the orphans' court, it was patent error for the court to forgo the termination of Father's parental rights simply because it preserved Mother's parental rights. Our Supreme Court expressly rejected this precise proposition in In re Burns, 379 A.2d 535, 541 (Pa. 1977) ("Nothing in the Adoption Act requires that an agency, which has assumed custody of a child, must establish grounds for the involuntary termination of both parents, before it can obtain such a decree as to either."). While Burns was decided under a prior version of the Adoption Act, nothing in the current Act contradicts the Court's decision. See In re C.W.U., Jr., 33 A.3d 1 (Pa. Super. 2011); see also In re E.M., 908 A.2d 297, 299 n.1, 309 (Pa.Super. 2006) (vacating the order terminating the mother's parental rights even though the father's parental rights were terminated and he did not appeal).

Furthermore, although § 2511(a)(5) and § 2511(a)(8) do not apply to Father because he was incarcerated when the Agency removed S.K.L.R. and L.M.J.R. from Mother's care, the certified record demonstrates that the Agency established by clear and convincing evidence the statutory grounds to terminate parental rights pursuant to 2511(a)(2), based upon Father's repeated and continued incapacity to parent. In re C.S., 761 A.2d 1197, 1200 n.5 (Pa.Super. 2000) (en banc) ("As subsections (a)(5) and (8) are both predicated on removal of the child from the care of the parent, they are similarly inapplicable in this context" because the child was never in the incarcerated parent's care).

With regard to termination of parental rights pursuant to § 2511(a)(2), we have indicated:

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met:  (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

In re Adoption of M.E.P., supra at 1272 (citation_omitted).  "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct.  To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties."  In re Adoption of C.D.R., supra at 1216 (quoting In re A.L.D., supra at 337). As this Court has previously stated, "Parents are required to make diligent

efforts towards the reasonably prompt assumption of full parental responsibilities. . . . [A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." In re A.L.D., 797 A.2d 326, 340 (Pa.Super. 2002) (internal quotation marks and citations omitted).

In In re Adoption of S.P., 47 A.3d 817 (Pa. 2012), our Supreme Court concluded,

> incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.

Id. at 328-29, 828; see also In re D.C.D., 105 A.3d 662, 675 (Pa. 2014) (holding that incarceration prior to the child's birth and until the child was at least age seven renders family reunification an unrealistic goal and the court was within its discretion to terminate parental rights "notwithstanding the agency's failure" to follow court's initial directive that reunification efforts be made). The Court in S.P. further stated,

> the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2). See e.g. Adoption of J.J., 515 A.2d [883, 891 (Pa. 1986)] ("a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties."); [In re] E.A.P., 944 A.2d [79, 85 (Pa.Super. 2008)](holding termination under § 2511(a)(2) was supported by mother's repeated incarcerations and failure to be present for child, which caused child to be without

essential care and subsistence for most of her life and which cannot be remedied despite mother's compliance with various prison programs).

In re Adoption of S.P., supra at 830 (footnote omitted).

Instantly, the orphans' court abused its discretion in finding that the Agency failed to satisfy its burden under § 2511(a)(2) with respect to Father. The record reveals that Father has been incarcerated the entirety of S.K.L.R.'s and L.M.J.R.'s placement. N.T., 1/16/20, at 47, 69. While he spoke with the children during paternal grandmother's monthly visitation, and claims to have mailed correspondence to the foster home, Father has not had visitation with S.K.L.R. and L.M.J.R. since they were removed from placement with paternal grandmother in June 2018, eleven months before the Agency sought to terminate parental rights. Id. at 70-72, 98, 117. Moreover, his last correspondence to Agency caseworker, Tara Lorenzo, was on December 10, 2018. Id. at 74-75. Ms. Lorenzo did acknowledge that Father inquired about visitation. Id.

In sum, Ms. Lorenzo's testimony confirms that Father demonstrated a repeated incapacity, abuse, neglect, or refusal to perform parental duties as he has been incarcerated for the entirety of the twenty-five months that S.K.L.R. and L.M.J.R. have been in Agency custody. Id. at 76. This incapacity has caused S.K.L.R. and L.M.J.R. to be without essential parental care, control, or subsistence necessary for their mental well-being. Id. at 76. Moreover, Father has not remedied his situation or shown that he will be able to remedy

his situation as he remains incarcerated and, while he claims to have completed several programs and asserts that his level of classification precludes him from participating in others, he neglected to provide any documentation for either assertion.[9]  Id. at 77-78, 101.

Furthermore, noting that Father would be eligible for parole as soon as spring 2020, having been previously denied in October 2018, Ms. Lorenzo cautioned that immediate reunification would be impossible.  She testified,

> Father does not have a substantial relationship with the children.  He has been incarcerated for most of [S.K.L.R.'s and L.M.J.R.'s] lives.  Father would need to contact the Agency to be assessed for services, and then he would need to initiate those services and begin to make progress before the Agency would consider a reunification.  We would need him to successfully complete services.

Id. at 79 (emphasis added).  Ms. Lorenzo explained that the duration to complete reunification "depends on [F]ather's willingness to participate and make progress."  Id. at 80.

While the orphans' court sought to forestall the termination of Father's parental rights until after he was paroled, when Father would presumably be positioned to care for S.K.L.R. and L.M.J.R., such a release is wholly speculative.  It is unacceptable for S.K.L.R. and L.M.J.R., who, at the time of the hearing, had already been in care for twenty-five months, to remain in

_____

[9] Father intimated that he possessed documentation but was unable to produce it during the hearing because of his recent transfer from SCI-Chester. N.T., 1/16/20, at 111.  He did not explain why he failed to include the information in his prior correspondence with the Agency.

limbo. As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not indefinitely subordinate a child's need for permanence and stability to a parent's claims of progress and hope for the future." In re Adoption of R.J.S., 901 A.2d 502, 513 (Pa.Super. 2006). Hence, we conclude that the court abused its discretion in finding that the Agency failed to meet its evidentiary burden under § 2511(a)(2) with respect to Father. See T.S.M., supra at 267; see also In re Adoption of M.E.P., 825 supra at 1272. Due, in part, to Father's incarceration, he is unavailable to S.K.L.R. and L.M.J.R. and is not likely to remedy that incapacity promptly, even if he is granted parole at the next available opportunity.

Likewise, the court abused its discretion in finding that the Agency failed to satisfy its evidentiary burden under § 2511(b). See T.S.M., supra at 267. Father did not have a substantial relationship with S.K.L.R. and L.M.J.R., having been incarcerated for all but nine months of S.K.L.R.'s life and all but two months of L.M.J.R.'s life. N.T., 1/16/20, at 77. He has been unavailable to the children physically and developmentally. Further, as indicated above, S.K.L.R. and L.M.J.R. are thriving together in a pre-adoptive kinship foster home, and they view their foster mother as their parent. Id. at 80-84. Accordingly, terminating Father's parental rights supports the developmental, physical, and emotion welfare of S.K.L.R. and L.M.J.R. The testimony of Ms. Lorenzo confirms as much, see id. at 81, and the Agency was not required to

present expert testimony or a bonding evaluation under the facts of this case. In re Z.P., supra at 1121.

Thus, we conclude the orphans' court erred and abused its discretion in finding that the Agency failed to meet its burden as to the termination of parental rights of Mother and Father. While Mother and Father may profess to love S.K.L.R. and L.M.J.R., a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. Id. As of the date of the hearing, S.K.L.R. and L.M.J.R. had been in placement for approximately twenty-five months, and are entitled to permanency and stability. Their lives "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." Id. at 1125.

In light of the above analysis, which did not require consideration of the disputed evidence, we need not consider the Agency's claim that the orphans' court erred in sua sponte excluding evidence as hearsay. Further, given our determination that the Agency presented clear and convincing evidence in favor of terminating the parental rights of Mother and Father, we do not address the Agency's remaining substantive issues.

Accordingly, for the foregoing reasons, we reverse the orders denying the Agency's petitions to involuntarily terminate Mother's and Father's parental rights to S.K.L.R. and L.M.J.R. We remand for entry of orders

involuntarily terminating the parental rights of Mother and Father within thirty days.

Orders reversed. Case remanded with instructions. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/13/2020